# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                                    Plaintiff,

v.                                                              Case No. 17-CR-84-JPS

TRAVIS S. VACCARO,                                       **ORDER**

                                    Defendant.

## 1.    INTRODUCTION

On May 2, 2017, the defendant, Travis S. Vaccaro ("Vaccaro"), was indicted by a grand jury on one count of unlawfully possessing a firearm after having previously been convicted of a felony. (Docket #1). On June 14, 2017, Vaccaro filed a motion seeking suppression of the evidence obtained as a result of a pat-down search and a search of his vehicle by Milwaukee police officers on the evening of February 9, 2017. (Docket #14). On July 17, 2017, Magistrate Judge Nancy Joseph conducted a hearing on Vaccaro's motion. (Docket #27, #28). On September 18, 2017, Magistrate Joseph issued a Report and Recommendation (the "Report") recommending denial of the motion. (Docket #36). Vaccaro timely filed an objection to the magistrate's Report, (Docket #39), and the government filed a response thereto, (Docket #40).

For the reasons explained below, the Court will adopt the magistrate's Report, overrule Vaccaro's objection, and deny his suppression motion.

**2. STANDARD OF REVIEW**

When reviewing a magistrate's recommendation, the Court is obliged to analyze the recommendation *de novo*. 28 U.S.C. § 636(b)(1)(C). Thus, the Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.* In other words, the Court's *de novo* review of Magistrate Joseph's findings and recommendations is not limited to her legal analysis alone; rather, the Court may also review her factual findings, and accept, reject, or modify those findings as it sees fit based upon the evidence. *Id.*

**3. RELEVANT FACTS**

Vaccaro does not object to any material facts as found by Magistrate Joseph. (Docket #39 at 2). In light of this, and having reviewed the evidence independently, the Court accepts the magistrate's findings of fact for purposes of resolving Vaccaro's motion. A summary of those facts, taken from the magistrate's Report and the evidence submitted in conjunction with the motion, is provided here.

On the evening of February 9, 2017, at about 7:00 p.m., Milwaukee police officers Aaron Frantal ("Frantal") and Matthew Tracy ("Tracy"), who were together in a police squad car, observed a vehicle drive through a red light at an intersection. Frantal activated the squad's lights signaling the vehicle's driver, Vaccaro, to stop. Vaccaro immediately pulled his car over and Frantal activated the squad's spotlight. The officers noticed Vaccaro making "furtive" movements toward the front passenger side of the floorboard and then toward the back seat of his vehicle. (Docket #28 at 11). While testifying at the evidentiary hearing before the magistrate, Frantal also described Vaccaro's movements as "ferocious" and "aggressive." *Id.* He stated that, based on his training and experience, he

believed Vaccaro was either attempting to conceal contraband, arm himself, or both. Tracy also testified that he believed Vaccaro was attempting to arm himself. *Id.* at 11-12.

Frantal, fearing for his and Tracy's safety, immediately exited his squad, drew his service pistol, and ordered Vaccaro to show his hands and exit his vehicle. Vaccaro complied, and Frantal handcuffed him and conducted a pat-down search. During the pat-down search, Frantal discovered a GPS monitoring bracelet on Vaccaro's left ankle. He asked Vaccaro about the bracelet, and Vaccaro responded that he was on supervision for "false imprisonment," a crime that Frantal and Tracy knew to be a felony in Wisconsin. While Frantal conducted the pat-down, Tracy asked Vaccaro a series of questions, including whether he had any firearms in the vehicle. Vaccaro did not answer Tracy's question about firearms at first, and then said, "I don't have anything." Tracy also asked Vaccaro about his movements in the car, and Vaccaro denied putting anything in the glove box, claiming he had just taken off his jacket. Vaccaro appeared nervous and paranoid, and Tracy testified that he believed Vaccaro was under the influence of drugs and that there was a possibility he would grab Frantal's gun or flee.

With Vaccaro handcuffed, Frantal and Tracy placed him in the back of their squad car and shut the door. Vaccaro then began screaming obscenities and appeared agitated. Frantal testified that he was still concerned for his safety because Vaccaro did not appear fully stable. However, Frantal testified that, at this point, he considered Vaccaro secured. Frantal called dispatch to report a traffic stop and Tracy began searching Vaccaro's vehicle, beginning in the front passenger area. Neither he nor Frantal asked Vaccaro for consent to search the vehicle. Tracy

asked Frantal if Vaccaro had any other keys (it appears Tracy could not get into the car's center console without a key), and, walking toward Vaccaro's vehicle, Frantal responded, "Keys? I don't believe so. He's got a fuckin' rifle in the back? That's a rifle case." *See* (Docket #14 at 3-4 and Ex. B; #28 at 83-84). Tracy looked into the back seat and said, "Yup, looks like it." *Id.* The officers removed a jacket from atop the rifle case, opened the case, and discovered a firearm.

At the evidentiary hearing, both officers testified that they saw the rifle case, mostly covered by a jacket, *before* placing Vaccaro in their squad. For several reasons, Magistrate Joseph did not credit this portion of the officers' testimony. First, nothing in the officers' conduct on the scene suggested that they saw the firearm case as early as they now say; neither officer informed the other of his observation when they approached Vaccaro's car or after they had secured him in their squad. Their explanation for their silence on this point was that they did not want to further agitate Vaccaro, but that explanation is contradicted by the fact that Tracy repeatedly asked Vaccaro whether he had firearms in the car, in the face of Vaccaro's increasing agitation. Next, had Tracy actually seen the rifle case in the back seat before securing Vaccaro in the squad, he likely would not have started his search of the vehicle with the front seat. Finally, Frantal did not mention suspicion of a firearm when he called dispatch to report the stop.

For these reasons, as set forth in the Report, the Court agrees with Magistrate Joseph's decision to discredit the officers' testimony that they observed a rifle case in Vaccaro's car before securing him in their squad. The government attempted to contest the magistrate's finding on this point, but it raised the issue for the first time in its response to the

defendant's objection to the Report. *See* (Docket #40 at 1). The government could have submitted its own objection to the magistrate's Report, but chose not to. The government's untimely evidentiary dispute will not be considered.

**4.     ANALYSIS**

Vaccaro moved on two grounds for suppression of evidence collected during and after the traffic stop, including the firearm recovered from his vehicle and statements he made while in custody later that night. First, he argued that the officers did not have a valid basis to frisk him after ordering him to step out of his vehicle. Second, he argued that the officers did not have a valid basis to search his vehicle after they had handcuffed him and secured him in their squad.

Magistrate Joseph considered both arguments and found that the officers had a valid basis to conduct both the frisk of Vaccaro's person and the search of his vehicle. As explained below, the Court agrees with the magistrate on both points.

**4.1     Pat-Down Frisk**

An officer is faced with an "inordinate risk" when he "approaches a person seated in an automobile." *Pennsylvania v. Mimms,* 434 U.S. 106, 110 (1977). In light of this danger, the Supreme Court has held that, during a traffic stop, an officer may conduct a protective pat-down search of the driver and any passengers if the officer reasonably fears for his safety. *United States v. Ford,* 333 F.3d 839, 843–44 (7th Cir. 2003). A protective pat-down search is appropriate only if the officer has "at a minimum some articulable suspicion that the subject is concealing a weapon or poses a danger" to the officer or others. *United States v. Pedroza,* 269 F.3d 821, 827 (7th Cir. 2001). Whether an officer has a reasonable suspicion to support

such a frisk "is a fact-specific inquiry that looks at the 'totality of the circumstances' in light of common sense and practicality." *United States v. Tinnie*, 629 F.3d 749, 751 (7th Cir. 2011) (quoting *United States v. Robinson*, 615 F.3d 804, 807–08 (7th Cir. 2010)).

The magistrate found that the officers were justified in conducting a pat-down because Vaccaro's furtive movements inside his vehicle reasonably caused the officers to suspect Vaccaro was armed or had concealed a weapon. *See* (Docket #36 at 8-9). As the magistrate noted, the case law in this circuit is clear: furtive movements during a traffic stop can justify reasonable suspicion to conduct a protective pat-down. *See United States v. Williams*, 76 F. App'x 728, 730–31 (7th Cir. 2003). In *Williams,* for example, the Seventh Circuit held that an officer had reasonable suspicion to conduct a pat-down search of the passenger of a stopped vehicle who "looked nervously at the approaching squad car, avoided eye contact, [and] moved furtively within the car[.]" *Id.* at 729. Similarly, in *United States v. Evans*, the Seventh Circuit held that "officers had reasonable suspicion to justify searching the passenger compartment of a car because, after the officers had activated their lights and sirens to pull the car over, the car's occupants were observed "lean[ing] forward at a forty-five degree angle for several seconds, as [if] to place or retrieve something under the seat." 994 F.2d 317, 321 (7th Cir. 1993).

Here, Vaccaro does not argue that he did not make *any* movements toward the back seat of his car after the officers pulled him over; he states that he was merely removing his jacket and placing it in the back seat, and that the officers' testimony concerning the "furtive" nature of his movements is hyperbolic. In other words, the officers undoubtedly observed some movement toward the front and back seats of the car when

Vaccaro pulled over. The magistrate credited the officers' testimony that they believed, based on these movements, that Vaccaro had potentially armed himself or concealed a firearm. (Docket #36 at 9). This Court, having reviewed the evidence independently, agrees.

Because the officers had a reasonable suspicion that Vaccaro was "concealing a weapon" or "pose[d] a danger" to the officers during the traffic stop, their protective pat-down search did not violate Vaccaro's Fourth Amendment rights. *Pedroza,* 269 F.3d at 827.

**4.2     Vehicle Search**

The next question, then, is whether Vaccaro's furtive movements, coupled with the few additional facts that developed during and after the pat-down, justified the further intrusion of a protective search of Vaccaro's vehicle.

Magistrate Joseph began her analysis related to the vehicle search by citing to the present dangerousness exception announced in *Long.* (Docket #36 at 9-10). In that case, the Supreme Court held that an officer with a reasonable suspicion that a motorist may be armed and may be able to gain immediate control of weapons may conduct a protective search of the passenger compartment of the vehicle without a warrant. *Long,* 463 U.S. at 1049–50; *United States v. Arnold,* 388 F.3d 237, 239 (7th Cir. 2004). Such a search must be confined to "those areas in which a weapon may be placed or hidden." *Long,* 463 U.S. at 1049.

Magistrate Joseph then discussed the officers' stated bases for searching Vaccaro's vehicle: his furtive gestures toward the front and back of the car, his status as a person on supervision following a felony conviction, and the officers' observation of a partially-covered rifle case in the vehicle's back seat. (Docket #36 at 10). Having discredited the officers'

testimony that they saw a rifle case in Vaccaro's car before searching it, the magistrate considered whether the officers' other stated grounds justified their search.

Magistrate Joseph found that the officers' observation of Vaccaro making furtive movements toward the front passenger and back seats of his vehicle justified their search. *Id.* at 12-13; *see also Evans*, 994 F.2d at 321 (defendant's leaning forward at a forty-five-degree angle for several seconds, as if to place or retrieve something under the seat, justified officers' protective search of the vehicle); *United States v. Nash,* 876 F.2d 1359, 1361 (7th Cir. 1989) (defendant's gestures of raising himself from the car seat and reaching for the floor may be reasonably interpreted as the hiding of a gun and thus support a protective search); *United States v. Denney,* 771 F.2d 318, 322 (7th Cir. 1985) ("The defendant's furtive gestures in moving or leaning toward the right side of the truck—a motion which the officers reasonably interpreted was consistent with reaching for a weapon—compounded the officers' belief that violence was imminent[.]").

In his objection to the magistrate's Report, Vaccaro argues that the circumstances of his vehicle's search are not analogous to those in any of the cases on which the magistrate relied. Unlike in those cases, Vaccaro argues that, in this case, the officers could not have reasonably feared for their safety at the time they conducted their search, with Vaccaro cuffed and locked inside the officers' squad. *See* (Docket #39 at 6-10). Indeed, in *Evans, Nash,* and *Denney,* where vehicle searches were permitted, the defendant was near the vehicle—not yet secured in a squad car—at the time of the search. In *Evans*, the defendant was handcuffed but stood near the rear of the car during the search. *Evans,* 771 F.2d at 319. The

defendants in *Nash* and *Denney* stood outside their vehicles, apparently uncuffed. *Nash,* 876 F.2d at 1360; *Denney,* 771 F.2d at 320.

As we know, a protective sweep of a vehicle under *Long* is only justified when officers reasonably believe the suspect is "dangerous" and "may gain immediate control of weapons." *Long*, 463 U.S. at 1049–50. Here, it appears tempting to find that, even if the officers reasonably believed Vaccaro had concealed a weapon in the back seat of his car, Vaccaro could not possibly have gained immediate control of a weapon located inside of his vehicle while he was handcuffed and secured in the back of the officers' squad car.

But Vaccaro's location during the search does not necessarily render the search improper. In *Long,* the Supreme Court explained that during any investigative detention, the suspect is "in the control" of the officers in the sense that he "may be briefly detained against his will." *Long*, 463 U.S. at 1051. Even when under officers' control, a suspect might "break away from police control and retrieve a weapon from his automobile." *Id.* Or, "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." *Id.* at 1052.

Applying the Supreme Court's holding in *Long* to facts very similar to those presented here, the Seventh Circuit found that a vehicle search was justified even though the suspect was secured in the back of a patrol car. *Arnold*, 388 F.3d at 238. The Court of Appeals explained that the officer "may have permitted [the suspect] to gather items from the car before leaving the scene," and the suspect "could have broken away from [the officer's] control." *Id.* at 241. The officer was justified, then, in searching the areas that were "immediately accessible to [the suspect]

while he was there." *Id.* at 240; *see also United States v. Holifield*, 956 F.2d 665, 668–69 (7th Cir. 1992) ("Once the occupants reentered the vehicle, it would have taken only a few seconds for [the suspect] or one of the passengers to . . . unlock the glove compartment, thus giving them immediate access to the pistol."); *United States v. Boden*, 854 F.2d 983, 994 (7th Cir. 1988) (Although the officer moved the suspect away from the vehicle to be searched, "there was still a continuing possibility that [the suspect] could reenter it, as he was not under arrest."); *Paige v. City of Fort Wayne*, No. 1:09-CV-143, 2010 WL 3522526, at *7 (N.D. Ind. Sept. 2, 2010) ("Even if the motorist is outside the car and under the temporary control of the police, handcuffed, as [the suspect] was in the backseat of a squad car for instance, a limited . . . investigatory search is still permissible given that at the time it occurred, [the suspect] could still have eventually regained entry to the vehicle.").

In this case, Vaccaro was not under arrest when the officers placed him in the back of their squad car. If the traffic stop resulted only in the issuance of a citation for running a red light, Vaccaro would have been permitted to reenter his vehicle and leave the scene. If that were the case, Vaccaro would have had immediate access to any weapon that was located in the area of the car that the officers searched. Further, the officers still had reason to suspect that the car contained a weapon. They initially suspected, when Vaccaro first pulled over, that Vaccaro had either armed himself or concealed a weapon, and the pat-down had not produced a weapon; if their initial suspicions were correct, a concealed weapon remained in the vehicle. Therefore, the second prong of the *Long* standard—that the officers reasonably believe the suspect could gain immediate control of a weapon—is satisfied here.

The remaining question, then, is whether the first prong of the *Long* standard is met here—namely, whether the officers reasonably believed Vaccaro was dangerous. The officers' stated bases for their suspicion of dangerousness (apart from their discredited testimony that they saw a rifle case in the back seat of Vaccaro's car) are few: Vaccaro's furtive gestures toward the front and then the back of his car immediately upon pulling over and his admission that he was on supervision for a felony. Other relevant circumstances include that Vaccaro had complied with the officers' directives to get out of the car and submit to a pat-down search, but also that he did not answer the officers' questions directly (eventually lying about having a gun) and acted paranoid and nervous, as if he was under the influence of a controlled substance. Then, once they secured him in their squad, Vaccaro grew increasingly agitated and screamed obscenities.

The Court is constrained to find that the facts of this case support the officers' stated fear that Vaccaro was dangerous and possibly armed. Here again, *Arnold* provides relevant guidance. In that case, upon signaling to the suspect to pull his car over, the officer saw the suspect "worm[] his way between the passenger and the driver's seats into the back seat" as if to either retrieve or place something in the back seat. *Arnold*, 388 F.3d at 238. The officer then approached the suspect's car and ordered him out. *Id.* He asked whether the suspect had a gun, to which the suspect answered no. *Id.* The officer conducted a pat-down because he feared the suspect had retrieved a weapon from the back seat, but the pat-down produced no weapon. *Id.* The suspect appeared very nervous and was sweating, but "was cooperative and was neither belligerent nor smelled of alcohol." *Id.* The officer placed the suspect in the back seat of

the patrol car "so that he could ensure that the traffic stop was completed safely." *Id.* The officer then searched the suspect's vehicle. *Id.*

The Seventh Circuit made quick work of deciding that those circumstances justified the officer's belief that the suspect could be dangerous. It held simply that: "In this case [the officer] had reasonable suspicion that [the suspect] may have retrieved or concealed a weapon based on his unusual movements." *Id.* at 240 (citations omitted). Similarly, in *Fryer,* the Seventh Circuit condoned a search based solely on "furtive" gestures between a driver and passenger of a car that had been signaled to pull over in "a marginally safe neighborhood, in the wee hours of the morning." *Fryer,* 974 F.2d at 819.

The facts of this case do not differ meaningfully from those of *Arnold* such as to demand a different outcome. Both Frantal and Tracy testified that they observed Vaccaro make furtive movements toward the front passenger seat and then the back seat of his car immediately after pulling over. The hour was relatively late on a February evening, meaning darkness would have enveloped the encounter. Vaccaro appeared nervous. All of these facts mirror those in *Arnold.* Further, the officers testified that Vaccaro's actions during their encounter were consistent with someone who was under the influence of a controlled substance—an additional factor signaling dangerousness not present in *Arnold*.[1]

Moreover, Vaccaro did nothing to quell the officers' fear of his dangerousness after he was placed in the back of the squad. In fact, he grew more agitated, causing the officers to believe he was unstable. The

---

[1]In fact, the officers were correct. The police report from the incident shows that, after being taken to the station, Vaccaro indicated he was under the influence of crack cocaine and needed medical attention, which he received. (Docket #14-1 at 7).

Supreme Court instructed in *Long* that an officer's decision to search a vehicle is properly informed by the possibility that the suspect will be permitted to reenter his vehicle, at which time he would have access to any weapons inside. *Long*, 463 U.S. at 1052. In this case, the officers were justified in fearing that Vaccaro would pose a risk to their safety if allowed to reenter a vehicle that possibly contained a weapon.

The Seventh Circuit has found circumstances similar to, if not less dangerous than, those presented here sufficient to justify a suspicion of dangerousness warranting a vehicle search. This Court will not depart from this precedent.

**5.     CONCLUSION**

The government has carried its burden to show that the pat-down and vehicle search in this case conformed to the bounds of the Fourth Amendment. The Court will, therefore, overrule the defendant's objection, (Docket #39), adopt Magistrate Joseph's Report, (Docket #36), and deny Vaccaro's motion to suppress, (Docket #14).

Should Vaccaro wish to resolve this case short of trial and remain eligible for acceptance of responsibility credit, counsel for Vaccaro must notify the Court of such intention, including the filing of a written plea agreement, within **ten (10) days** from entry of this Order.

Accordingly,

**IT IS ORDERED** that Magistrate Judge Nancy Joseph's September 18, 2017 Report and Recommendation (Docket #36) be and the same is hereby **ADOPTED**;

**IT IS FURTHER ORDERED** and that the defendant's objection to the Report and Recommendation (Docket #39) be and the same is hereby **OVERRULED**; and

**IT IS FURTHER ORDERED** that the defendant's motion to suppress (Docket #14) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 13th day of December, 2017.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge